UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 09-100(ADM/JJG)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | **GOVERNMENT'S TRIAL MEMORANDUM** |
| | ) | |
| v. | ) | |
| | ) | |
| ROBERT DALE GORIS, | ) | |
| | ) | |
| Defendant. | ) | |

The United States of America, by and through its attorneys, B. Todd Jones, United States Attorney for the District of Minnesota, and Michael L. Cheever and Kimberly A. Svendsen, Assistant United States Attorneys, submits this memorandum outlining the evidence which the government intends to produce at trial.  This memorandum is also submitted in support of the Government's Motions in Limine To Admit Other Bad Act Evidence under Rule 404(b), To Exclude Certain Exhibits and Limit Certain Testimony, and Regarding Proposed Defense Expert Dr. Wayne G. Siegel.

## FACTUAL AND PROCEDURAL BACKGROUND

From the late 1970's until 2002, defendant Robert Goris was a very successful insurance salesman in the Willmar, Minnesota, area. He sold insurance and investment products for the Franklin Life Insurance Company through his agency, The Becomers.

From 2000 through 2009, Goris engaged in an extraordinary campaign to evade his income taxes.

**Goris' Tax Evasion in 2000.**  In the mid-to-late nineties, Goris filed timely tax returns which were prepared by a legitimate

tax preparation business in Willmar, Minnesota.  From 1995 through 1998, the average adjusted gross income for Goris and his wife was over $300,000 per year.

In 1999, Goris earned over $500,000.  Rather than file state and federal tax returns for 1999 and pay the taxes he owed, Goris began evading his income taxes.  Three significant events mark his tax evasion at this time.  First, Goris did not file timely state or federal tax returns for 1999.

Second, Goris hired L. Scott Roberts and American Tax Consultants of Florida to draft frivolous tax documents.  These included an amended 1998 tax return in which Goris claimed he had $0 income that year and requested a refund of the $104,535 of taxes he had previously paid.  Goris also claimed in that submission that he was not a United States citizen.  It appears that Goris had American Tax Consultants of Florida prepare a similar return for tax year 1999.[1]

Third, Goris hired Innovative Financial Consultants (IFC), an Arizona group, to set up two abusive trusts, Oakdale Holdings and Oakdale Facilitators ("the Oakdale trusts").  The two trusts supposedly owned each other, but they were controlled by Goris.  It is unclear how Goris used the Oakdale trusts in 2000 or 2001, but

---

[1]L. Scott Roberts was convicted in December 2003 of helping clients file false claims with the IRS.

2

as is discussed below, he used them in 2002 and 2003 to hide his income from the IRS and the Minnesota Department of Revenue.[2]

**The 2001 Audits.** Goris' income in 1999 was reported by Franklin Life to the IRS. Both the IRS and the Minnesota Department of Revenue initiated investigations of Goris when he failed to file timely 1999 tax returns.

Goris eventually responded to the IRS and Department of Revenue audits by filing his 1999 tax returns and paying his taxes. He hired a legitimate tax preparation business in St. Cloud. With the help of CPA Scott Welle: (1) Goris filed a delinquent 1999 federal tax return and paid the taxes and penalties; (2) he obtained extensions to October 15, 2001, filed a timely 2000 federal tax return, and paid the year 2000 taxes he owed; and (3) in April 2002, Goris filed a timely 2001 tax return and paid his 2001 taxes.

**The 2002 Tax Return.** As of April 2002, Goris was current on his federal income taxes. He was already preparing, however, to evade his 2002 taxes.

In 2001 and 2002, AIG bought out Franklin Life, and Goris got out of the insurance business. In August 2002, AIG paid Goris

---

[2]In April 2003, several people involved with IFC were indicted for conspiring to help clients set up abusive trusts and LLCs to evade taxes. In December 2003, John Poseley and Jeffrey Lewis pled guilty to conspiring with, among others, Dennis Poseley and Keith Priest, both of whom were also eventually convicted of some or all of the tax charges against them. Goris worked with all four of these IFC defendants.

$2,550,000 for the residuals he held from his prior work with Franklin Life.  To avoid taxes on this money and to avoid taxes on his future income, Goris initially took two steps.  When they proved insufficient, he took a third step.

As a first step, Goris negotiated an unusual annuity with an Iowa church, Oakwood Road Church, and its affiliated organization, BILD International.  Pursuant to an agreement, Goris paid $1,150,000 to the church in August 2002.  In return, Goris was to be paid $102,000 per year for 20 years.  In addition, Goris arranged to characterize the payment, falsely, as a charitable contribution.  Goris made the payment in August 2002 and took a deduction for it on his 2002 tax returns.

As a second step, Goris used an LLC to hide some of his 2002 income.  In June 2002, Goris paid IFC, the Arizona group Goris used to set up the Oakdale trusts, to set up a Nevada limited liability company for him, Greater Resource Development LLC ("GRD").  Each of the two Oakdale trusts was listed as a 50 percent owner of GRD. Goris then arranged for some of his 2002 income to be paid to GRD.[3] GRD was set up as a "flow through" tax entity by which the income is reported by the LLC on a tax return but the taxes are paid by the owners of the LLC.  GRD filed a Form 1065 tax return for 2002

---

[3]The 2002 income paid to Goris through GRD came from two sources.  About $245,000 was from BILD International, a missionary group associated with Oakwood Road Church.  Another $145,000 was from the sale of Minnesota Corn Processors stock which had been transferred from Goris to GRD and then sold.

4

which reported its income, over $350,000, but showed it on Schedules K-1 "flowing through" to the two Oakdale trusts. No taxpayer identification numbers were given for the trusts, and neither the Oakdale trusts nor Goris reported the GRD income on a tax return or paid taxes on it.[4]

In March 2003, Goris had his legitimate tax preparer, Scott Welle, prepare 2002 state and federal tax returns for him. Goris did not tell Welle of the income paid through GRD, and he did not tell Welle that the $1,500,000 "charitable contribution" was actually a non-deductible loan/annuity. Even without the GRD income and with the $1,150,000 improper deduction, Welle calculated that Goris owed over $660,000 of federal income tax for 2002.

Goris decided not to file the state and federal tax returns prepared by Scott Welle. Instead, as a third step to evade his 2002 taxes, Goris paid Joseph Saladino of the Freedom & Privacy Committee ("FPC") in California to prepare a frivolous "claim of right" tax return for him.[5] The FPC prepared 2002 state and federal tax returns for Goris which were very similar to the returns prepared by Welle. The federal return did not report the

---

[4]The Forms 1065 for GRD were prepared by the firm of Reed Barker, a CPA in Colorado. Barker was indicted in November 2005 for conspiring to defraud the IRS and helping to prepare false tax returns. He pled guilty to the conspiracy charge in January 2008.

[5]Joseph Saladino was indicted in December 2007 for conspiring with Michael Mungovan and others to defraud the IRS by, among other things, filing claim of right returns. Saladino and Mungovan, who also helped Goris, were convicted in November 2009.

GRD income and it included the improper $1,150,000 "charitable deduction."  In addition, however, it listed a bogus "claim of right" deduction for $2,623,933.[6]  Goris then filed the 2002 federal return asserting he owed $0 in taxes and requesting a refund of the $15,000 he had paid as estimated taxes in 2002. Goris filed a 2002 state tax return which was based on the frivolous 2002 federal return.

In November 2003, Goris applied for a home equity line of credit through Countrywide.  During the application process, Goris was required to provide copies of his 2001 and 2002 federal tax returns.  Instead of providing a copy of the "claim of right" return he actually filed for 2002, Goris had Scott Welle provide the mortgage broker with a copy of the 2002 federal tax return Welle prepared, which made it appear that Goris paid over $660,000 of federal income tax for 2002.  Goris signed a certification stating that the tax returns he submitted in connection with his loan application were correct copies of the returns he actually filed.

**Notice of Criminal Charges Against IFC and the 2003 Tax Return.**  In 2003, Goris arranged for most of his income, over

---

[6]There is a legitimate deduction called a claim of right deduction which is available in rare circumstances which did not apply to Goris in 2002.  The "claim of right" deduction listed on Goris' return asserted that income from personal labor was not taxable, a position frequently taken by tax protestors and uniformly rejected by the courts.

$300,000, to be paid through GRD.  About $220,000 was from BILD International, and about $108,000 was from interest on $1,200,000 of loans Goris made to Metro Gem.[7]

Also in 2003, the IRS executed a search warrant on IFC in Arizona.  It seized numerous records relating to the sham trusts and the LLC scheme it was selling.  An IFC file for Robert Goris was found which included documents relating to the purchase of the Oakdale trusts.

Several people from IFC were indicted in April 2003, and in December 2003, one of those people, John Poseley, pled guilty.  In January 2004, the IRS sent a letter to IFC customers, including Goris, advising that the LLC scheme was illegal, that several people had been indicted, and that John Poseley had pled guilty. A press release regarding the guilty plea was enclosed with the letter.  The letter also urged the IFC customers not to use the illegal LLC scheme and instead to report the LLC income on their personal tax returns.  A copy of the letter addressed to Goris was found at his home in 2006 during the execution of a search warrant there.

---

[7]Metro Gem was a company controlled by Frank Vennes.  In 2008, a criminal investigation of Vennes was begun relating to a Ponzi scheme.  The investigation is continuing.  Goris did not lose any money on his Metro Gem loan.  In 2003 and 2004, he was paid all of the interest he was owed, and in 2004 he was repaid his entire $1,200,000 of principal.

Goris did not heed the advice in the IRS letter. Instead he again used the LLC scheme for tax year 2003. He had Welle prepare his state and federal 2003 tax returns but did not tell him about the income he concealed through GRD. Instead, Goris again used Reed Barker's firm in Colorado to prepare Forms 1065 for GRD showing the income flowing through to the Oakdale trusts.[8]

In April 2004, Goris also set up a fraudulent "corporation sole," Bought With A Price Ministries, and began hiding his income through it rather than through GRD. A corporation sole is a corporation consisting of a single person and is used today rarely, usually by a bishop or head of a diocese. In setting up Bought With A Price Ministries, Goris claimed he was a church and could deposit his income and pay his living expenses through the church bank account.

**The 2004 Audits.** In August 2004, both the IRS and the Minnesota Department of Revenue began investigating Goris again, this time for tax years 2002 and 2003. The Minnesota Department of Revenue moved quite rapidly. It assessed over $29,000 of additional taxes against Goris in October 2004.[9]

---

[8]In November 2005, after Goris knew his LLC scheme had been discovered, he filed amended Forms 1065 for GRD and reported the GRD income on Schedules K-1 as flowing through to himself. Although admitting his responsibility for this income, Goris did not file new personal tax returns for 2002 or 2003, and he did not pay any taxes on this income.

[9]Goris had previously paid over $115,000 of state taxes for 2002 in spite of filing the frivolous "claim of right" return.

In response to the federal audit, Goris retained a CPA from Texas, Wayne Paul, to prepare a new 2002 federal tax return for him.  Goris apparently did not advise Wayne Paul of the concealed GRD income or of the improper $1,150,000 "charitable contribution," and Paul prepared a tax return which was very similar to what Scott Welle had prepared.  It showed Goris owed, with a late filing penalty, over $680,000 in taxes.  A second 2002 federal return prepared by Paul was drafted claiming the $2,550,000 payment from AIG had been for sale of a business, rather than for residuals. Even with capital gains treatment of the AIG payment, this draft of the 2002 tax return showed Goris still would owe over $337,000 of federal income taxes.  Goris did not file either of the Wayne Paul tax returns, and he did not pay any of the 2002 taxes he owed.

In December 2004, the IRS Revenue Agent conducting the federal audit, Anna Johnson, sent Wayne Paul two press releases relating to the IFC investigation, the fraudulent LLC scheme, and the guilty pleas in the case.  Paul apparently forwarded the articles to Goris as they were found at his house when the search warrant was executed in 2006.

**The Saladino/FPC Investigation and Injunction**.  In March 2004, search warrants were executed on the home of Joseph Saladino and on his business, the FPC.  A file relating to Robert Goris and his 2002 "claim of right" return were found at the business.  The file also showed Goris intended to file claim of right returns for 1999

through 2001 to try and obtain refunds of the taxes paid in those years. Emails between Goris and Saladino were found on the computers.

In December 2004, a permanent injunction was issued against Saladino and the FPC prohibiting them from, among other things, preparing the "frivolous" and "fraudulent" claim of right tax returns. Saladino was required to send a copy of the permanent injunction order to his customers, including Goris. Goris received the January 2005 letter with the December 2004 order, and copies of them were found in Goris' home pursuant to the 2006 search warrant.

**The Initial Criminal Investigation of Goris and the Closed Bank Account Scheme**. In January and February 2005, the IRS audit stopped and an IRS criminal investigation of Goris began. In March 2005, Goris was notified of the IRS criminal investigation. Summonses were issued at that time seeking records from Goris, from his LLC and trusts, from Wayne Paul, and from others.

In April 2005, Goris hired Mark Wagner and The Light of Life Society in California to help him respond to the criminal investigation and to the Minnesota Department of Revenue assessment of additional 2002 taxes. As part of his response, Goris opened a bank account at US Bank, a bank where he had no other accounts. He deposited $500, obtained check blanks for the account, and quickly closed out the account. Goris then wrote checks on the closed account. In May 2005, Goris sent cover letters and checks to the

IRS for 2002 and 2003. The 2002 check was for $3,556,411 and the 2003 check was for $141,035. The checks were described as "capital contributions." In May 2005 he sent a check from the closed account for $33,000 to the Minnesota Department of Revenue along with a cover letter which indicated the check was for 2002. The IRS and Minnesota Department of Revenue tried to cash the checks, but they were returned by US Bank as having been drawn on a closed account. When the Minnesota Department of Revenue advised Goris that the check had been drawn on a closed account, he sent another check drawn on the closed account, this time for $38,000. Goris stated in a July 6, 2005, cover letter with the check that it was for the 2002 state taxes assessed against him.

**The 2005 State Tax Lien and Goris' Asset Protection Schemes**. In 2005 Goris took additional steps to hide his assets from the IRS and the Minnesota Department of Revenue, this time with the help of Shawn Rice of Arizona and his company, the Society of the Israelite Mosaic Paternal Ethic (SIMPE).

In May 2005, Goris purported to place a one hundred billion dollar ($100,000,000,000) lien on himself which would give him priority over other creditors to his bank accounts, land, airplanes, boats, and other assets. He filed the supposed lien with the Minnesota Secretary of State and with the Iowa Secretary of State.

In June 2005, Goris set up two trusts with Shawn Rice, the Land Trust and the Transport Trust.  The trusts were in Rice's name but were controlled by Goris.  In December 2005, the Minnesota Department of Revenue filed a tax lien with the Kandiyohi County Recorder's Office based on its 2002 tax assessment.  In January 2006, Goris paid his 2002 state taxes with a cashier's check and obtained a release of the lien.  A few days later he and his wife began transferring land they owned free and clear into the Shawn Rice Land Trust.  This included a $209,000 lake lot Goris had purchased in the name of his Oakdale Holdings trust.[10]  Goris sold the lake lot in 2007 for over $400,000.  The money was funneled back to Goris through Shawn Rice.

Also in June 2005, Goris transferred 98 percent of the ownership interest in an airplane he owned into the second Shawn Rice trust, the Transport Trust.  Goris sold the airplane in 2005 and 2007.  He received four payments of over $120,000 each in 2005,

---

[10]Goris was not able to transfer the land which he and his wife did not own free and clear into the Shawn Rice Land Trust.  He and his wife owned other real estate with over $1,000,000 of equity, but certain bank loans were secured with this real estate and it could not be transferred into the Land Trust without paying off the loans.  When Goris was interviewed by Pretrial Services in this case, he admitted owning the real estate which had not been transferred into the Land Trust.  He did not reveal his ownership and control of the real estate which he held in the Land Trust.

2007, 2008, and 2009.  The money was funneled back to Goris through Shawn Rice and entities Goris, his wife, and his son controlled.[11]

**The 2006 "No Income" Scheme and the 2007 "Filing in Lieu of 1040."**  In August 2006, Goris filed Substitute Forms 1099-R for himself.  He did so for every entity that had reported to the IRS making payments to Goris in 2002 and 2003, including the $2,550,000 payment from AIG.  Goris then filed Affidavits and other documents with the IRS claiming he had "no income" in the years 2002 or 2003. This set of filings also related to tax years 2004 and 2005.  Goris did not file legitimate tax returns for 2004 or 2005.

Goris also did not file a legitimate tax return for 2006. Instead, in 2007, Goris filed a document titled "Filing in Lieu of 1040" in which he claimed he was not a United States citizen, income taxes are voluntary, and income from labor is not taxable.

**The October 2008 Blank Tax Return Scheme and 1099-OID Scheme.** In October 2008 and January 2009, Goris filed frivolous tax returns and other documents for 2001 through 2007.

For the years 2001 through 2004, Goris filed a Form 56 (Notice Concerning Fiduciary Relationship) in which he appeared to claim he was a trust and that a Department of Treasury official in Puerto Rico was his fiduciary.  He then sent tax returns to an official in Puerto Rico, at least for 2003 and 2004.  These Form 1040 tax

---

[11]Shawn Rice was indicted in March 2009 for money laundering. The charges are still pending.

returns were signed by Robert Goris and his wife, but were otherwise blank. Documents with the Form 56 asked that an IRS representative in Fresno, California, fill out the tax returns.

Also in October 2008, Goris executed a fraudulent refund scheme for tax year 2007 and appears to have also done so for tax years 2005 and 2006. The scheme had two parts. First, Goris sent to the IRS Forms 1099-OID (Original Issue Discount) which were purportedly from banks and other entities. The Forms 1099-OID indicated Goris had been earned large amounts of money, such as $194,649.03 from Wells Fargo Bank, but the Forms also claimed that the entire amount earned by Goris had been withheld for federal taxes, such as $194,649.03 by Wells Fargo Bank. For the second part of the scheme, Goris submitted a tax return which reported all of the income ($416,423 in 2007), calculated the taxes owed on that income ($113,098 in 2007), reported the amount that supposedly had been withheld and paid to the IRS ($416,393 in 2007), and then sought a refund ($303,295 for 2007). A refund was nearly sent out by the IRS to Goris for $226,882 for tax year 2007 because of this scheme.

**The December 2008 Form W-8BEN.** In December 2008, Goris submitted another frivolous document to the IRS. He signed and submitted a Form W-8BEN claiming he was a transient foreigner and not a United States citizen.

14

**The Indictment.**   Goris was indicted in April 2009.  He is charged with two counts of tax evasion, specifically evading the assessment of taxes.  Count 1 relates to the 2002 tax year and Count 2 relates to the 2003 tax year.

## THE DEFENDANT'S EFFORTS TO EVADE TAXES ARE ADMISSIBLE IN THE GOVERNMENT'S CASE IN CHIEF

In order to demonstrate the defendant's continuing evasion of his income tax for the charged tax years, and in order to meet its burden of proving that the defendant acted willfully, the government intends to introduce evidence of frivolous documents the defendant filed with the IRS and the Minnesota Department of Revenue between the years 2000 and 2008.  In addition to the evidence specifically referenced in the indictment, the government will offer the following:

1.   1998 and 1999 Forms 1040X claiming $0 income, claiming $0 tax owed, and seeking a refund of $104,535, together with a Form 8275-R (Regulation Disclosure Statement) and related correspondence claiming the defendant is not a United States citizen;

2.   Forms 4852 (Substitute for Form W-2) for the years 2002 and 2003, as well as related correspondence and affidavits claiming the defendant received no income in years 2002 through 2005;

3.   2006 "Filing in Lieu of 1040;"

4.   Forms 56 and related affidavits, letters, and Forms 1040 for the years 2002 through 2004 claiming $0 income and $0 tax owed;

5.   2005 through 2007 Forms 1096 with Forms 1099-OID and corresponding Forms 1040 seeking refunds;

15

6.  Forms W-8BEN (Certificate of Foreign Status of Nonresident Alien);

7.  Evidence of false tax returns filed with the Minnesota Department of Revenue; and

8.  Checks drawn from closed US Bank Account to the Minnesota Department of Revenue in the amounts of $33,000 and $38,000 in May and July 2005.

These documents are admissible as res gestae for two reasons.

First, because tax evasion is a continuing offense, see United States v. Barker, 556 F.3d 682, 689 (8th Cir. 2009), evidence regarding the defendant's efforts to evade his 2002 and 2003 taxes is admissible, regardless of when those efforts occurred. An act of evasion can include "any conduct, the likely effect of which would be to mislead or to conceal." United States v. Schoppert, 362 F.3d 451, 460 (8th Cir. 2004) (citation omitted). Because tax evasion requires proof of an act of evasion, and because those acts may continue indefinitely, the government should be permitted to introduce evidence of the defendant's continued acts of evasion that occurred after his initial filing of his improper 2002 and 2003 federal tax returns.

Second, evidence of the defendant's frivolous filings with the IRS regarding tax years 1998, 1999, and 2004 through 2007 and evidence of the defendant's frivolous filings with the Minnesota Department of Revenue are relevant to the essential element of willfulness. In a tax evasion case, the government must prove beyond a reasonable doubt that the defendant's alleged violations

16

were willful and not done in good faith. See Cheek v. United States, 498 U.S. 192, 201 (1991). It is settled law that evidence of a defendant's tax-related patterns and practices both before and after the period alleged in an indictment is admissible in tax prosecutions as probative of willfulness. See United States v. Upton, 799 F.2d 432, 433 (8th Cir. 1986) ("Evidence of [a taxpayer's] questionable compliance with tax laws, both in the years prior to and subsequent to [the years in which the tax crimes are charged], is probative of willfulness."); United States v. Serlin, 707 F.2d 953, 959 (7th Cir. 1983) ("Proof of a taxpayer's failure to file a return prior or subsequent to the years in question has been consistently held relevant to the issue of willfulness.").[12]   All of the listed evidence regarding the defendant's long history of frivolous filings with the IRS and the Minnesota Department of Revenue indicates a deliberate and concerted attempt by the defendant to evade his taxes, and it should be admitted in the government's case in chief.

## GOVERNMENT'S MOTION TO ADMIT OTHER BAD ACT EVIDENCE UNDER RULE 404(b)

The government intends to offer evidence of the defendant's use of a fraudulent "corporation sole" to hide his income beginning

---

[12] See also United States v. McKey, 942 F.2d 477, 480 (8th Cir. 1991) (collecting cases holding such evidence admissible in tax cases on 404(b) grounds).   In addition to being admissible as res gestae, such evidence would clearly be admissible as evidence of the defendant's motive, intent, plan, knowledge, and absence of mistake or accident pursuant to Rule 404(b).

in 2004, his attempt to place a $100 billion lien on his own property in May 2005, and his use of a Land Trust and a Transport Trust to hide his assets and income beginning in June 2005. This evidence is admissible under Rule 404(b) because it is relevant to show the defendant's motive, intent, plan, knowledge, and absence of mistake or accident in connection with the tax evasion counts at issue in this case.

Under Rule 404(b) of the Federal Rules of Evidence, the prosecution may not introduce prior bad acts of a defendant to establish his character or in order to infer that he acted in conformity therewith on a particular occasion. The prosecution may, however, offer bad acts or crimes to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Fed. R. Evid. 404(b). Rule 404(b) is a rule of inclusion, permitting admission of bad act evidence unless it serves <u>solely</u> to show the defendant's criminal propensity. <u>United States v. Thomas</u>, 58 F.3d 1318, 1321 (8th Cir. 1995); <u>United States v. Crook</u>, 935 F.2d 1012, 1015 (8th Cir. 1991).

In determining the admissibility of prior bad acts under Rule 404(b), the Eighth Circuit asks whether the evidence meets the following four prongs:

1.  The evidence of the bad act or other crime is relevant to a material issue raised at trial;

2.  The bad act or crime is similar in kind and reasonably close in time to the crime charged;

3.    There is sufficient evidence to support a finding
      by the jury that the defendant committed the other
      act or crime; and

4.    The potential prejudice of the evidence does not
      substantially outweigh its probative value.

United States v. DeAngelo, 13 F.3d 1228, 1231 (8th Cir. 1994)

(citation omitted); see also United States v. Johnson, 439 F.3d

947, 952 (8th Cir. 2006) (same).

The defendant's use of a "corporation sole" and two trusts to
hide his income and assets and his attempt to place a $100 billion
lien on his own property meet all four of these criteria.  First,
the evidence is relevant to the material issue of the defendant's
willfulness in evading his income tax obligations and undercuts any
argument that the defendant acted in good faith.  Second, all three
of these actions were initiated in 2004 and the first half of 2005,
while the defendant was still taking steps to evade his income tax
for the charged 2002 and 2003 tax years, and at a time the
defendant knew the IRS and Department of Revenue were entitled to
the taxes he owed and would soon be looking to collect.  Third, the
government will offer sufficient evidence to establish that the
defendant took each of these actions, including documents found in
the defendant's home during the 2006 search.  Finally, the
probative value of this evidence far outweighs any potential
prejudice to the defendant, as each of these three acts directly
relates to the defendant's continued scheme to evade his taxes.
Thus, this evidence is admissible under Rule 404(b) to demonstrate

the defendant's motive, intent, plan, knowledge, and absence of mistake or accident.

## GOVERNMENT'S MOTION TO EXCLUDE CERTAIN EXHIBITS AND LIMIT CERTAIN TESTIMONY

Based on the defendant's actions prior to indictment, which included filing a host of frivolous tax documents with the IRS and the Minnesota Department of Revenue, as well as the government's familiarity with litigation strategies in similar cases, the United States anticipates that the defendant may try to present arguments and evidence at trial regarding the legality of the Internal Revenue Code, as well as other quasi-legal arguments that have been rejected as frivolous by every court that has considered them. Such arguments and evidence are inadmissible, and their admission would usurp the Court's authority and confuse the jury.

The United States respectfully asks the Court, therefore, to prevent the defendant from: (1) arguing or presenting evidence regarding incorrect interpretations of the law; (2) presenting testimony and exhibits that are inadmissible to establish a good faith defense; and (3) introducing the movie "America: Freedom to Fascism" into evidence.

**1.      The Defendant Should Be Prohibited from Presenting Incorrect Interpretations of the Law During Opening Statement, Closing Argument, or Any Other Stage of the Proceedings Occurring in Front of the Jury.**

Based on the defendant's actions prior to indictment and notice provided by defense counsel of their intent to use the movie

"America: Freedom to Fascism," the United States anticipates that the defendant may attempt to advise the jury that the criminal tax statutes are invalid, and he may attempt to present incorrect interpretations of the Constitution, federal statutes, and case law in opening statements, in closing arguments, and at other times during the course of trial. This Court should preclude the defendant from presenting such arguments and evidence because it would invade the province of the Court's authority and have the potential to confuse the jury.

"'In the orderly trial of a case, the law is given to the jury by the court and not introduced as evidence.'" United States v. Bernhardt, 642 F.2d 251, 253 (8th Cir. 1981) (quoting Cooley v. United States, 501 F.2d 1249, 1253-54 (9th Cir. 1974)). "It is the function of the jury to determine the facts from the evidence and apply the law as given by the court to the facts as found by them from the evidence." Id. Allowing the defendant to present incorrect interpretations of the law would only interfere with the Court's authority to give legal instruction and should therefore be prohibited in this case.

In addition to interfering with the province of the Court, evidence based on incorrect interpretations of the law would also confuse the jury. Courts have recognized that juries must be protected from improper statements of the law. See Bernhardt, 642 F.2d at 253 ("Obviously, it would be most confusing to a jury to

21

have legal material introduced as evidence and then argued as to what the law is or ought t be"); see also United States v. Flitcraft, 803 F.2d 184, 186 (5th Cir. 1986) (holding that the district court was correct in excluding case law and other documents offered by the defendant because they "presented a danger of confusing the jury by suggesting that the law is unsettled and that it should resolve such doubtful questions of law"). In particular, in a criminal tax case, "introduction of . . . statutes and judicial opinions would have . . . a high potential to confuse the jury and conflict with the court's responsibility to instruct on the law." United States v. Willis, 277 F.3d 1026, 1033 (8th Cir. 2002).

Because the defendant's presentation of his own interpretations of the law would interfere with the Court's authority to give instruction on the law and would confuse the jury, such evidence should be excluded.

## 2. The Defendant Should Be Prohibited from Presenting Evidence That Is Irrelevant to a Good Faith Defense.

The United States anticipates that the defendant may argue that he had a good faith basis for filing false tax returns and other frivolous documents. While good faith is a recognized defense against the crime of tax evasion, the defendant should be prohibited from presenting evidence that is irrelevant to establishing a good faith defense and he should be required to lay

proper foundation before offering extrinsic evidence in support of such a defense.

The Supreme Court has recognized that a defendant charged with tax crimes can offer a defense that is based on "ignorance of the law or a claim that because of a misunderstanding of the law, he had a good-faith belief that he was not violating any of the provisions of the tax laws." Cheek v. United States, 498 U.S. 192, 202 (1991). Cheek, however, held that a defendant may not argue that his decisions were made in good faith because he believed that the tax laws were unconstitutional - this argument does not constitute a good faith defense. 498 U.S. at 206 ("[A] defendant's views about the validity of the tax statutes are irrelevant to the issue of willfulness and need not be heard by the jury . . ."). The Cheek Court's holding was based on the distinction between people who unknowingly violate the law because it is so complex or confusing (i.e., good faith) and those who claim to have sophisticated interpretations of the law which they know are inconsistent with prevailing legal interpretations:

> Claims that some of the provisions of the tax code are unconstitutional are submissions of a different order. They do not arise from innocent mistakes caused by the complexity of the Internal Revenue Code. Rather, they reveal full knowledge of the provisions at issue and a studied conclusion, however wrong, that these provisions are invalid and unenforceable.

Id. at 205; see also United States v. Miller, 634 F.2d 1134, 1135 (8th Cir. 1980) ("[A] person's belief that the tax laws violate his

constitutional rights does not constitute a good faith misunderstanding of the requirements of the law.").

Therefore, if the defendant contends he believed the laws were unconstitutional when he acted, such a contention does not establish a valid good faith defense. As the <u>Cheek</u> court noted, a defendant in a tax evasion case is free to believe that the laws are invalid, but "like defendants in criminal cases in other contexts, who 'willfully' refuse to comply with the duties placed upon them by the law, he must take the risk of being wrong." <u>Id.</u> at 206.

Finally, a good faith defense must be based on beliefs that the defendant held <u>at the time that he embarked on the criminal conduct alleged in this case</u>. <u>United States v. Marston</u>, 517 F.3d 996, 1003 (8th Cir. 2008) ("Marston argues that the district court erred in refusing to admit into evidence a video tape of Larkin Rose describing his § 861 teachings. Marston admitted, during an in camera hearing regarding admission of the video, that the tape did not exist until 2002. The alleged acts occurred between 1999 and 2001, well before the video tape was created."). The United States anticipates that the defendant may seek to introduce books, treatises, or testimony of witnesses to substantiate assertions that he acted in good faith in this case. Before any extrinsic evidence in support of such a defense can be admitted, however, the defendant should be required to lay proper foundation for its

24

admissibility - that is, by establishing through competent evidence that the defendant was aware of the specific evidence offered <u>before</u> he embarked on the criminal conduct alleged in this case <u>and</u> that he relied on it when he committed the acts. <u>Marston</u>, 517 F.3d at 1003; <u>United States v. Burton</u>, 737 F.2d 439, 444 (5th Cir. 1984) (finding no error where district court excluded testimony of tax professor as part of the defendant's good faith defense, noting that "[i]t is significant that Burton did not in his proffer suggest that he relied upon the expressed views of the tax professor in not paying his taxes or in inadequately completing the required tax forms"). The Eighth Circuit has imposed similar foundational requirements in cases in which defendants assert a good faith reliance on the advice of legal counsel. For example, in <u>United States v. Poludniak</u>, the Eighth Circuit affirmed the following instruction given by a district court in an extortion and conspiracy case:

> If the defendant <u>before taking any action</u> sought the advice of an attorney whom she considered competent, in good faith, and for the purpose of securing advice on the lawfulness of her possible future conduct and made a full and accurate report to her attorney of all material facts of which she has the means, and knowledge and acted strictly in accordance with the advice of her attorney following her full report, then the defendant would not be willfully doing wrong in doing something the law forbids.

657 F.2d 948, 959 (8th Cir. 1981). Similarly, the Seventh Circuit has held that:

> In order to establish an advice of counsel defense, a defendant must establish that: (1) before taking action, (2) he in good faith sought the advice of an attorney whom he considered competent, (3) for the purpose of securing advice on the lawfulness of his possible future conduct.

Liss v. United States, 915 F.2d 287, 291 (7th Cir. 1990) (citing E. Devitt and C. Blackmar, Federal Jury Practice and Instruction 14.12 (3d ed. 1977)).

It is clear that when presenting a good faith defense, a defendant must show that he held particular beliefs before committing the alleged offense.  In this case, if the defendant seeks to offer testimony or exhibits containing tax theories or advice, he must establish that he consulted these materials or individuals before he acted.  If the defendant did not consult such sources until after he committed the alleged offense, it is clear that such information did not shape his viewpoints at the time of the offense.  Absent this showing of prior consultation, such evidence is not relevant to the defendant's claims of good faith.

### 3.   The Defendant Should Be Prohibited from Introducing the Movie "America: Freedom to Fascism" into Evidence.

The defendant has notified the government of his intent to "designate" a movie, "America: Freedom to Fascism," evidently to be offered as evidence through the testimony of an unknown witness. The government objects to the introduction of this movie and requests that the Court prohibit its introduction.  "America: Freedom to Fascism" appears to be a film produced by Aaron Russo

which, according to the internet, was released to the public on July 28, 2006.[13]  It is a one hour and fifty-one minute movie that touches on a number of different anti-government themes, including the argument that there is no legal authority for the Internal Revenue Service to tax income.  It contains a lengthy segment specifically addressed to jurors, advocating for jury nullification in criminal tax cases.  It advises viewers that if they sit on a jury in a criminal tax case, they should demand that the judge provide them a physical copy of the law that permits the IRS to tax income and if it is not forthcoming, they should disregard the judge's instructions and acquit the individual.  In addition, the movie argues that the Federal Reserve was created illegally and describes the dangers of electronic implants in humans, national identification cards, electronic voting machines, and globalization.

The government objects to the introduction of this movie for three reasons.  First, as set forth above, the defendant should not be permitted to present evidence based on incorrect interpretations of the law or advocating the defendant's belief as to what the law ought to be.  See Bernhardt, 642 F.2d at 253.  Because the primary

---

[13] The government was not provided with a copy of the movie.  However, the government reviewed the movie, which is available for free on the internet, to prepare this motion.  The Court can review the movie, if desired, at: http://justgetthere.us/blog/archives/America-Freedom-to-Fascism-Aaron-Russos-Directors-Cut.html.  This version of the movie is dated April 13, 2009.

premise of "America: Freedom to Fascism" is that the federal income tax is unconstitutional, it cannot form the basis for any good faith defense on the defendant's behalf.  <u>See</u> <u>Cheek</u>, 498 U.S. at 206.  As such, the movie is irrelevant and should not be shown to the jury.

Second, even if the movie could somehow form the basis for a good faith defense, the defendant would first have to lay a proper foundation to show that he watched the movie and relied upon it <u>before</u> he embarked on the tax evasion alleged in this case.  <u>See</u> <u>Marston</u>, 517 F.3d at 1003.  However, "America: Freedom to Fascism" was not released until July 2006.  By this time, the defendant had already filed a $0 income tax return for 1998, failed to file a timely return for 1999, used an LLC scheme to hide income for tax years 1999, 2000, 2002, and 2003, filed a 2002 return omitting the LLC income and further claiming a frivolous "claim of right" deduction, received notice from the IRS that the LLC scheme was illegal, filed a 2003 return again utilizing the LLC scheme, set up a fraudulent "corporation sole" to hide his income, been audited for tax years 2002 and 2003 by both the IRS and the Minnesota Department of Revenue, received notice of a permanent injunction prohibiting the FPC from preparing "frivolous" and "fraudulent" claim of right returns, sent checks to the IRS on closed bank accounts for tax years 2002 and 2003, placed a $100 billion lien on himself, and set up two additional trusts to hide his assets.

Because the defendant took all of these actions before "America: Freedom to Fascism" was even released, it appears unlikely that he will be able to lay an adequate foundation for his reliance on the movie.

Finally, the movie should not be admitted because its prejudicial effect significantly outweighs its probative value. In particular, its segments on the relevant "law" and its advocacy in favor of jury nullification would primarily serve to confuse the jury. Therefore, the defendant should not be permitted to introduce into evidence the movie "America: Freedom to Fascism."

## GOVERNMENT'S MOTION IN LIMINE REGARDING PROPOSED DEFENSE EXPERT DR. WAYNE G. SIEGEL

The government requests that the defendant's proffered expert witness, psychologist Wayne G. Siegel, be prohibited from testifying to the ultimate issues before the jury, including whether the defendant had the requisite mental state constituting an element of the crime charged. In his notice of expert witnesses, the defendant states that Dr. Siegel may be asked to testify regarding the following three issues: (1) "Dr. Siegel might testify about the psychological underpinnings of Goris's formation of a good faith belief, through the influence of self-professed tax expert's teachings, that he was acting lawfully;" (2) "Dr. Siegel might testify in rebuttal to the Government's willfulness arguments;" and (3) "Dr. Siegel might testify about his findings

when he investigated whether Mr. Goris had possible memory impairments."  (Doc. No. 34 at 5-6.)

Dr. Siegel's expert report indicates that it is "quite plausible" that the defendant could "engage in the behaviors that led to the current charges and not have full realization that his actions were illegal, especially if others he deemed as credible where [sic] advising him as such."  (Dr. Siegel's Report[14] at 10.) After recognizing that the defendant "is functioning in the High Superior range of intellectual abilities with his working memory abilities falling in the Superior range . . .," Dr. Siegel concludes that the defendant's decisions are "typically not made based on facts and details, [so] little attention is paid to such information at the time of the decision."  (Id. at 9-10.)  Thus, the defendant's "difficulty recalling detailed information about his investments" is likely based on his personality style.  (Id. at 10.)

Expert testimony in a criminal case is subject to the limitations of Federal Rule of Evidence 704(b), which provides:

> No expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto.  Such ultimate issues are matters for the trier of fact alone.

---

[14] For the Court's convenience, the government is submitting a copy of Dr. Siegel's expert report under separate cover.

Dr. Siegel should be prohibited from testifying that the defendant did not act willfully or that the defendant had a good faith belief that he was acting lawfully, as these are ultimate issues regarding the defendant's mental state which constitute an element of tax evasion and a defense thereto.  See United States v. Felak, 831 F.2d 794, 797-98 (8th Cir. 1987) (affirming district court's exclusion of psychiatrist's expert testimony that tax defendant "was obsessed with his beliefs, and that as a result he did not possess 'the requisite mental state to satisfy the meaning of the words "willful" or "evasion" or "fraud" as contained in the allegations raised against him'") (citing United States v. Ellsworth, 738 F.2d 333 (8th Cir. 1984) (affirming district court's exclusion of psychiatrist's expert testimony that defendant's "failure to file income tax returns had been perpetrated in good faith")).

Finally, the court in Felak stated that the district court properly could have excluded the defendant's expert testimony because the defendant violated Rule 12.2, which requires a defendant who intends to introduce expert evidence relating to his mental condition to notify the government and file a notice with the clerk's office prior to the motions filing deadline.  831 F.3d at 798 n.5.  In this case, after several continuances requested by the defendant, the motions filing deadline was set for September 15, 2009.  The defense first informed the government that it

31

"might" designate Dr. Siegel as an expert on December 28, 2009, and did not produce an expert report until January 22, 2010.  Thus, the Court could exclude Dr. Siegel's testimony based on the defendant's violation of Rule 12.2.

Dated: February 18, 2010                    Respectfully Submitted,

                                            B. TODD JONES
                                            United States Attorney


                                            s/Michael L. Cheever
                                            BY: MICHAEL L. CHEEVER
                                            Assistant U.S. Attorney
                                            Attorney ID No. 192582


                                            s/Kimberly A. Svendsen
                                            BY: KIMBERLY A. SVENDSEN
                                            Assistant U.S. Attorney
                                            Attorney ID Number 235785CA